Dr. Roger H. HOU, Plaintiff,

v.

COMMONWEALTH OF PENNSYLVA-
NIA, DEPARTMENT OF EDUCATION,
SLIPPERY ROCK STATE COLLEGE,
Defendant.

Civ. A. No. 79–1038.

United States District Court,
W.D. Pennsylvania.

Nov. 7, 1983.

Shelley W. Elovitz, Pittsburgh, Pa., for plaintiff.

Jack E. Solomon, Regional Legal Counsel, State System of Higher Educ., Pittsburgh, Pa., for defendant.

## OPINION

COHILL, District Judge.

### BACKGROUND

This is an action under the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e *et seq.* 42 U.S.C. § 2000e–2 provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Plaintiff also alleges a violation of the Civil Rights Act of 1870, 42 U.S.C. § 1981 which provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

These claims are brought against Slippery Rock State College, for alleged acts of discrimination and discriminatory application of standards against plaintiff, Dr. Roger Hou, on account of race, national origin, and religion. The alleged discriminatory treatment occurred in conjunction with the decision not to promote plaintiff from associate professor to full professor of mathematics. Plaintiff seeks promotion, back pay, and with regard to the § 1981 claim, declaratory and injunctive relief.

### JURISDICTION

This Court has subject matter jurisdiction over the claims asserted in this case under 28 U.S.C. §§ 1331(a), 1343(3), 1343(4), § 706 of EEOC Act of 1972, 42 U.S.C. § 2000e *et seq.* (Supp. V) *amending* Civil Rights Act of 1964, and 42 U.S.C. § 2000e–5(f)(3).

### STRUCTURE OF MEMORANDUM

Fed.R.Civ.P. 52(a) directs that a trial court, in all nonjury cases, "find the facts specifically and state separately its conclusions of law thereon...." Rule 52 is generally understood as requiring the trial court to make far more detailed findings of fact than a jury is required to make when a case is submitted under Fed.R.Civ.P. 49(a), requiring "a jury to return only a special verdict in the form of a special written finding upon each issue of fact." In order to avoid findings on mixed questions of law and fact, we will separately state the facts which form the basis for our legal conclusions.

*Procedural History*

Plaintiff filed the complaint in this case in July of 1979, alleging he was denied a promotion because of his race, religion and national origin. An order granting the defendant college's motion to dismiss parts of the complaint was entered on December 10, 1979. The portions dismissed were:

a. Count One (containing allegations that defendant violated Title VII of the Civil Rights Act of 1964, as amended, and also claiming relief under 28 U.S.C. §§ 2201 and 2202).

b. The portions of Count Two claiming violations of 42 U.S.C. § 1983 and the Fourteenth Amendment.

c. The portion of Count Two claiming a right to damages under 42 U.S.C. § 1981.

(The portion of Count Two claiming a right to equitable relief was allowed to stand.)

The dismissal of the Title VII claim was due to the fact that the plaintiff's EEOC charge appeared to have been not timely filed; the charge was filed on August 17, 1976, but plaintiff's complaint alleged that his denial of promotion was in 1975, prior to the 180-day time limit prescribed in Title VII. The § 1983 and Fourteenth Amendment claims, and the damages claim under § 1981 were dismissed on grounds of jurisdiction, immunity and failure to state a claim.

An amended complaint was filed alleging the denial of a promotion in 1976. After another motion to dismiss by defendant, the parties stipulated that the § 1983 claims, the Fourteenth Amendment claims, and the claim for damages under 42 U.S.C. § 1981 were not revived by the amended complaint. This Court's order, dated June 3, 1980, held that the defect in the Title VII claim was cured by the amended complaint because it alleged the denial of a promotion in 1976.

Defendant's motion to dismiss the amended complaint was granted by the June 3, 1980 order as to claims brought by plaintiff under the Pennsylvania Public School Code 24 P.S. § 1–101 *et seq.* Dismissal was premised on the Court's discretion to abstain from exercising pendent jurisdiction over the state law claims.

After a four-day trial, this Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

A. *The Parties*

Plaintiff, Dr. Roger Hou, is a naturalized citizen of the United States of America, of Chinese origin, Oriental race and Confucian religion. He was born January 6, 1934 at Chang-shia, Hunan Province, China. After teaching in Hong Kong in 1958 and 1959, Dr. Hou came to the United States to study. He became a United States citizen in 1964, and, in 1965, received his Ph.D. degree from the University of Indiana at Bloomington. In 1965, Dr. Hou was appointed assistant professor of mathematics at the University of New Hampshire, where he remained for four years. He was appointed associate professor of mathematics at Slippery Rock State College in 1969.

Defendant, Slippery Rock State College, is an employer engaged in industry affecting interstate commerce, employs more than fifteen (15) persons and is an employer within the meaning of 42 U.S.C. § 2000e(b). Furthermore, defendant is a State College in and for the Commonwealth of Pennsylvania, as set forth in 24 P.S. § 20–2001, *as amended.*

Defendant College maintains its office and principal place of business at Slippery Rock, Butler County, Commonwealth of Pennsylvania 16057.

B. *Structure of the College and Administrative Procedures Governing Promotion*

Slippery Rock State College, during the years in question, was an institution of approximately 4,000 students and 350 faculty. The college ranks its faculty in 3 grades: assistant professor, associate professor, and full professor. Candidates for promotion are judged on the basis of peer review at three levels: the department, the particular school, and the college. Dr. Hou was a member of, and judged by, the faculty of the Math Department, the School of Natural Sciences and Mathematics, and Slippery Rock State College.

Pursuant to a collective bargaining agreement between the Association of State College and University Faculties ("APSCUF") and the Commonwealth of Pennsylvania, each state college, including Slippery Rock State College, adopted a statement on "promotion, policies and procedures" which set up guidelines for faculty participation in making recommendations for promotions.

The college's policy on promotions provided that persons seeking promotion, in addition to fulfilling the minimum statutory requirements for promotion, and, in addition to fulfilling the minimum obligations, should be considered in terms of achieving a rating of "Excellent" in: (a) teaching

**1542**

effectiveness; (b) mastery of subject matter; (c) continuing scholarly growth; and (d) contributions to the college. (Plaintiff's Exh. 39 "APSCUF" Agreement, Article XVI)

According to testimony, the most important of the criteria was teaching effectiveness because the college was primarily a teaching rather than a research institution. Teaching effectiveness was measured by student evaluations, quality of course syllabi prepared by the candidate, reports of classroom visitation by peers, the department chairperson's evaluation, and also by the teacher's general reputation for effectiveness. Contributions to the college included significant contributions to work on the college's committees, special individual assignments, and participation in community work in a professional capacity that brought recognition to the college. According to testimony, the number of committees on which a candidate for promotion served was not as important as the quality and significance of his contribution to the committees.

The promotion process at Slippery Rock is initiated by the individual professor who submits an application with supporting materials to the College-Wide Promotions Committee. ("CWPC"). (Plaintiff's Ex. 28, 1976 Application of Roger Hou). Professors are evaluated in several ways, at several different levels. Peer evaluation is part of this process, a system in which other members of the academic faculty observe some classes that a particular faculty member conducts. The faculty member is then provided with a written evaluation, which is made part of his personnel file. Departmental promotions committees also formulate recommendations as to promotions, which are then forwarded to the college-wide promotion committee. The chairman of each department writes a recommendation, as does the dean of the particular school.

The department chairmen at Slippery Rock State College are members of the same bargaining unit as the rest of the faculty and are elected by their peers. While they have administrative duties, they are not quite members of the administration; however, they file a separate evaluation of the faculty members in their departments.

The ultimate decision on promotion is made by the president of the college, who receives the recommendations of the faculty through the college-wide promotions committee, the dean of the school, and the Vice-President for Academics Affairs for the college. The president also takes into consideration his own knowledge of the candidates for promotion.

The College-Wide Promotions Committee is responsible for gathering the applications, evaluating applicants, and making recommendations to the President of the College. The CWPC is composed of nine members, elected by the faculty. All faculty, regardless of grade, are eligible for the committee. Members serve for a three-year term, with $\frac{1}{3}$ of the committee changing each year. Each school is represented on the CWPC.

### C. Plaintiff's Application Record Regarding Promotions

Dr. Hou was first employed by Slippery Rock State College as an Associate Professor of Mathematics in 1969. He was awarded tenure in 1973–74. Each year, from 1972, up to and including June 30, 1976, plaintiff applied for promotion to full professor and was denied the promotion. This constituted a total of six rejections.[1]

### 1. The 1972 Application

In 1971, plaintiff first applied for promotion to the position of full professor of mathematics in the School of Natural Sciences and Mathematics. Dr. Clair McClure, the department chairman, recom-

---

**1.** Each application period seems to have begun in the fall, with promotion being decided in the spring for the following academic year. Thus, Dr. Hou applied in 1971–72 for the 1972–73 academic year. His final application occurred in 1976 for the 1977–78 academic year. We will refer to each application by the year in which it would have been granted.

mended plaintiff for promotion, citing Dr. Hou's publication in the Canadian Journal of Mathematics (Volume 23, 1971) of an article entitled "Quasi-Splitting Exact Sequence." (Plaintiff's Exh. 44). George Smith, then Dean of the School of Natural Sciences and Mathematics, recommended against promotion, however, expressing the concern that 2 ½ years was too short a time in which to evaluate an individual for promotion to full professor. (Plaintiff's Exh. 1). While President Watrel awarded plaintiff a "merit" salary increase in August 1972, plaintiff was denied promotion for that year.

## 2. The 1973 Application

On December 15, 1972, Dr. Clair McClure, Chairman of the Math department, recommended plaintiff for promotion, citing plaintiff's publication and work on departmental committees. (Plaintiff's Exh. 45). On February 6 and March 5, 1973, plaintiff received two generally favorable class observation reports from colleagues Professors Pagano and Sah. (Plaintiff's Exhs. 52 and 57). On March 5, 1973, however, the CWPC recommended against plaintiff's promotion. (Plaintiff's Exh. 81). Considerations included both plaintiff's individual record and a comparison with others applying for the same rank. The Committee observed that 32 of 83 total applications were for the rank of full professor.

On March 29, 1983, Professors Pagano and McClure met regarding plaintiff's teaching effectiveness. In a memorandum summarizing the meeting, they expressed concerns with regard to plaintiff's answering questions, providing solutions before testing, allowing time for questions, and speaking more slowly to prevent plaintiff's accent from interfering with the discourse (Plaintiff's Exh. 36). On April 16, 1973, Professor McClure gave plaintiff a generally favorable class observation. He noted plaintiff's accent, his efforts to speak slowly, and some accompanying tendency to be repetitive. (Plaintiff's Exh. 48). On May 30, 1973, plaintiff was granted tenure; he was denied promotion for 1973.

## 3. 1974 Application

The evidence with regard to this application period shows that on December 4, 1973, plaintiff received a favorable class evaluation by Professor Pagano. (Plaintiff's Exh. 7). On December 26, 1973, Howard Campaigne, Chairman of the Departmental Promotions Committee, recommended plaintiff's promotion. His memorandum noted that, within the department, plaintiff was ranked second for promotion to professor, and fifth overall in the department (Plaintiff's Exh. 47). On January 8, 1974, Department Chairman McClure recommended plaintiff for promotion. He also stated that plaintiff was ranked second for promotion to professor and fifth overall in the department. (Plaintiff's Exh. 46). On February 20, 1974, Professor McClure gave plaintiff a generally favorable class observation report. He commented, however, on some problems with teaching methods regarding the emphasis of the class presentation (Plaintiff's Exh. 49; includes letter from plaintiff to James Roberts, Vice-President for Academic Affairs, rebutting negative comments in the evaluation).

On May 3, 1974, a memorandum was sent from the CWPC to each applicant for promotion, stating the recommendation of the Committee. The memo informed Dr. Hou that the CWPC had recommended against his promotion. Areas specified by the CWPC as needing improvement were teaching effectiveness and committee work. (Plaintiff's Exh. 39).

On May 13, 1974, Dr. Carlton Dresden, Dean of the School of Natural Sciences and Mathematics, recommended to James Roberts, Vice-President for Academic Affairs, that plaintiff not be promoted. He observed that plaintiff's "excellence in subject area" did not overcome his weakness in committee work and teaching effectiveness. (Plaintiff's Exh. 37).

On May 15, 1974, Vice-President Roberts recommended to President Watrel against plaintiff's promotion. (Plaintiff's Exh. 63).

## 4. 1975 Application

On March 14, 1975, Professor McClure, Chairman of the Math Department, recom-

mended to the CWPC against plaintiff's promotion. His memorandum cites good peer evaluations received by plaintiff as well as accent and grammatical problems, student criticisms of plaintiff's ability to answer questions clearly, and problems with regard to plaintiff's working relationship with other department members. Plaintiff received an evaluation of "good" in teaching effectiveness; "excellent" in mastery of subject, "good" in continuing scholarly growth; and "average" in contributions to college. (Plaintiff's Exh. 38).

On April 21, 1975, the CWPC recommended against plaintiff's promotion. (Plaintiff's Exh. 29). On May 15, 1975, Professor McClure wrote a class observation report regarding Dr. Hou, noting plaintiff's accent and rapid speech. Expressing the view that student complaints could be an excuse for poor performance, Dr. McClure noted that the number of complaints received was deserving of mention. (Plaintiff's Exh. 30). On May 20, 1975, Dr. Dresden, Dean of the School of Natural Sciences and Mathematics, recommended against plaintiff's promotion in a memorandum to Dr. James Roberts, Vice-President for Academic Affairs. (Plaintiff's Exh. 31). On May 30, 1975, Dr. Roberts recommended against a promotion for plaintiff in a memorandum to President Watrel. (Plaintiff's Exh. 32).

### 5. *1976 Application*

On December 12, 1975, Howard Campaigne, Chairman of the Math Department, recommended to the CWPC that plaintiff be promoted. He rated plaintiff's teaching effectiveness "good"; mastery of subject matter "excellent"; continuing scholarly growth "good"; and contributions to college "good." Plaintiff was ranked first in the department for promotion to professor, and second overall in the department. (Plaintiff's Exh. 53).

A general departmental evaluation for 1975 noted general student dissatisfaction, the refusal of plaintiff to grant access to the material in his personal file beyond one or two documents, and plaintiff's lengthy rebuttal to minor comments in one class evaluation. (Plaintiff's Exh. 35).

On March 31, 1976, Dr. Dresden, Dean of the School of Natural Sciences and Mathematics, recommended against plaintiff's promotion to James Roberts, Vice-President for Academic Affairs. Dresden cited conscientious progress by plaintiff, but noted the need for more service to the college. He rated plaintiff in teaching effectiveness, "good"; mastery of subject matter, "excellent"; continuing scholarly growth, "good"; and contributions to college, "good." (Plaintiff's Exh. 33). On May 10, 1976, Dr. Roberts, Vice-President for Academic Affairs, recommended against plaintiff's promotion in a memorandum to President Watrel. (Plaintiff's Exh. 34). On June 16, 1976, plaintiff wrote to then Acting-President Roberts protesting his failure to be promoted after 5 applications, and listing his personal accomplishments. (Plaintiff's Exh. 17). On June 30, 1976, Acting-President Roberts denied plaintiff a promotion. (Plaintiff's Exh. 3).

### 6. *1977 Application*

On December 8, 1976, plaintiff submitted a group of documents to the CWPC together with his application for promotion. Included was a departmental recommendation in favor of promotion. (Plaintiff's Exh. 28, list of documents). The CWPC recommended against promotion, summarizing plaintiff's application and recommendations in a chart. The committee cited the need for additional committee work at the college-wide level, plaintiff's relatively limited participation in professional activities, a need for more research by plaintiff in order for him to be favorably compared with others applying for rank of professor, and the "good" rating in teaching effectiveness. (Plaintiff's Exh. 27, dated March 1, 1977). On June 24, 1977, Acting-President Roberts denied plaintiff a promotion to full professor.

### APPLICABLE LAW

#### A. *The Title VII Claim*

"The central focus in a [Title VII disparate treatment] case such as this is always whether the employer is treating

'some people less favorably than others because of their race, color, religion, sex or national origin.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting *Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) the Supreme Court set forth the applicable guidelines as to burden of proof in a "disparate treatment" case. The oft-repeated four-part test for establishment of a prima facie case is that plaintiff

> ... (i) belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualification....

*Id.* at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.

■ The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 295, 58 L.Ed.2d 216 (1978) (per curiam). Once the employer has articulated a legitimate reason for rejecting the applicant, the inquiry does not end, but the plaintiff is given a chance to show that the employer's reason is a pretext for discrimination. 411 U.S. at 804–05, 93 S.Ct. at 1825, 36 L.Ed.2d at 679. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207, 215 (1981); *Jackson v. United States Steel Corp.*, 624 F.2d 436, 442 (3d Cir.1980). This established framework for Title VII cases was recently reaffirmed by the Supreme Court in *United States Postal Service Board of Governors v. Aikens*, —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). There, the Court emphasized that

when an employer responds to plaintiff's proof by offering evidence of its reason for plaintiff's rejection, the factfinder must reach the question of whether the rejection was discriminatory within the meaning of Title VII. *Id.* at ——, 103 S.Ct. at 1482. Regarding the question of proof, while the plaintiff bears the burden of showing that the employer's articulated reason is pretextual, plaintiff's case may be proven by direct or circumstantial evidence. *Id.* at ——, 103 S.Ct. at 1483. A plaintiff in a Title VII disparate treatment case is not required to submit direct proof of discriminatory intent. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977) ("[T]he *McDonnell Douglas* formula does not require direct proof of discrimination.") *See Kunda v. Muhlenberg College*, 621 F.2d 532, 541–44 (3d Cir.1980) for a clear discussion of the steps of proof in a Title VII case.

■ The *McDonnell Douglas* test was specifically applied to a situation involving tenure and promotion in an academic setting in *Kunda v. Muhlenberg*, 621 F.2d 532 (3d Cir.1980). In *Banerjee v. Board of Trustees of Smith College*, 495 F.Supp. 1148 (D.Mass.1980), *aff'd*, 648 F.2d 61 (1st Cir.1981), *cert. denied* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981), the district court restricted the language of the *McDonnell Douglas* test in this context, requiring that a plaintiff in a tenure or promotion case show

> (1) that plaintiff is a member of a racial or national origin minority;
>
> (2) that plaintiff was a candidate for [promotion] and was qualified under [Slippery Rock] standards, practices or customs;
>
> (3) that despite his qualification plaintiff was rejected; and
>
> (4) that [promotion] positions in the Department of [Mathematics] at [Slippery Rock] were open at the time plaintiff was denied [promotion], in the sense that others were granted [promotion] in the department during a period relatively near

to the time plaintiff was denied [promotion].

*Banerjee*, 495 F.Supp. at 1155. We find this restatement of the prima facie test a valid one for cases alleging disparate treatment in situations involving promotions.

### B.  *The § 1981 Claims*

■ Section 1981 grants to all persons within the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens. . . ." 42 U.S.C. § 1981. While § 1981 has been held to prohibit discrimination on the basis of race, *see McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the courts have held that the statute does not provide a remedy for discrimination based on religion, *Runyon v. McCrary*, 427 U.S. 160, 167, 96 S.Ct. 2586, 2592, 49 L.Ed.2d 415 (1976), or national origin, *Woods v. New York*, 469 F.Supp. 1127 (S.D.N.Y.), *aff'd*, 614 F.2d 1293 (2d Cir.1979); *National Ass'n of Gov't Employees v. Rumsfeld*, 413 F.Supp. 1224 (D.D.C.1976), *aff'd*, 556 F.2d 76 (D.C. Cir.1977). Purposeful discrimination must be proved in an action brought under § 1981. *General Building Contractors, Inc. v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Croker v. Boeing*, 662 F.2d 975, 988 (3d Cir.1981). The evidence of discrimination can be analyzed within the framework established in *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Baldwin v. Birmingham Board of Education*, 648 F.2d 950, 955 (5th Cir.1981); *Taylor v. Jones*, 653 F.2d 1193, 1201 (8th Cir.1981) (citing cases utilizing principles of Title VII cases as to proof). Plaintiff seeks only declaratory and injunctive relief under this statute, and the same factual allegations constitute the basis for both claims.

### DISCUSSION

■ Plaintiff has alleged that he was not promoted to full professor because of purposeful discrimination on the part of Slippery Rock College. We accept that plaintiff has made out a prima facie case, i.e., (1) that he is a·member of a racial minority (Oriental), (2) that he was qualified for promotion in the years in question (1972–77)[2], (3) that he was not promoted, and (4) that other white, native American faculty members were promoted. In response, the college articulated a legitimate reason for not promoting Dr. Hou, namely, that his teaching was only average, and that his contribution to committee work was less than adequate. We do not believe plaintiff has proven either of these reasons to be a pretext for purposeful discrimination.

In evaluating plaintiff's claims in this case, we are aware of the general lack of success of women and minorities in Title VII actions against academic institutions. The trend in many courts has been to exercise minimal scrutiny of college and university employment practices, due, in large part, to the subjective factors on which many academic employment decisions are based. *See Powell v. Syracuse Univ.*, 580 F.2d 1150, 1153 nn. 8 & 9 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). *But see Kunda v. Muhlenberg College*, 463 F.Supp. 294 (E.D. Pa.1978), *aff'd*, 621 F.2d 532 (3d Cir.1980). Concomitant with this trend, we note the danger that judicial abnegation may nullify the congressional policy articulated in the 1972 amendments which included academic institutions within the reach of Title VII. *See Powell, supra*, at 1153. Such cases require courts to achieve a delicate balance between proper rigorous scrutiny of and improper intervention into academic administration.

Plaintiff's allegations in this case derive from the uncontested facts that he is the

---

**2.** In view of all the evidence presented at trial, we have not scrutinized this particular aspect of plaintiff's *prima facie* case. *Compare Kunda v. Muhlenberg College*, 463 F.Supp. 294, 308 (E.D. Pa.1978) (*prima facie* case made out where plaintiff unanimously recommended for promotion) with *Presseisen v. Swarthmore College*, 442 F.Supp. 593, 611–12 (E.D.Pa.1977) (no *prima facie* case made out where plaintiff simply compared six women to similarly-situated men), *aff'd*, 582 F.2d 1275 (3d Cir.1978).

only member of the Mathematics Department who has not been promoted, and that he is Oriental. Professor Sah, also a member of the Mathematics Department, and Oriental, was promoted, but plaintiff discounted this because the promotion occurred in conjunction with retirement.

Plaintiff argues that the criticisms of his teaching ability were a pretext for discrimination, and points to several evaluations in which his accent was commented upon. (Plaintiff's Exhs. 9, 36, 38, 48). The issue of accent in a foreign-born person of another race is a concededly delicate subject when it becomes part of peer or student evaluations, since many people are prejudiced against those with accents. In the present case, however, we find that comments about Dr. Hou's accent, when made, were directed toward the legitimate issue of his teaching effectiveness. Teaching effectiveness, as the testimony at trial indicated, is an elusive concept, *see Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1354 (W.D.Pa.1977) (quoting *Peters v. Middlebury College*, 409 F.Supp. 857, 868, (D.Vt.1976) (evaluation of teaching ability necessarily matter of judgment)). Teaching effectiveness does, however, include the ability to communicate the content of a discipline, a quality which should be carefully evaluated at any college or university. Dr. McClure, in his recommendation to the College-Wide Promotion Committee dated March 14, 1975, stated:

> He is at a decided disadvantage in the classroom because of his natural accent. That is, he tends to speak too rapidly at times and his students often use this factor coupled with his repeated use of standard, clipped phrases such as "you see what I mean" and "I mean" as excuses to lose interest in the discussions. Though he is aware of this problem through evaluation conferences, he has a difficult time overcoming this handicap. The obvious grammatical errors on his application attest to his communication problems, but for the more serious stu-

dents they do not prove to be obstacles to learning.

(Plaintiff's Exh. 38).

In a document simply entitled "Chairmen's Evaluation of Professor Roger H. Hou," dated May 15, 1975, Dr. McClure stated:

> Students find him hard to understand because he tends to speak too rapidly, and he uses trite, repeated phrases quite often. Perhaps they are using this as an excuse for their poor performance, but there are sufficient complaints by competent students to warrant mentioning this problem in the evaluation.

(Plaintiff's Exh. 30).

Dr. Mary Alice Paul, a professor in the School of Education, and Chairman of the College-Wide Promotions Committee in 1975–76, testified that if a professor felt he or she was being evaluated unfairly, he or she could bring in outside evaluators, and these evaluations would have been considered by the promotions committee. The College offered to bring in independent evaluators for Dr. Hou and to pay for them, but plaintiff rejected the offer because of the fact that the Slippery Rock evaluations would continue to be considered (Cross exam. of Dr. Hou).

While the Math Department did make a recommendation on several occasions that Dr. Hou be promoted, testimony from members of the College-Wide Promotions Committee indicated that they never judged these recommendations to be strong ones. Committee members also testified that the positive evaluations of Dr. Hou with respect to "Mastery of Subject Matter" were never strong enough to outweigh the problems with teaching effectiveness. (Testimony of Dr. Mary Alice Paul, Chair, College Wide Promotions Committee, 1975–76, Roger Lamson, 1976 CWPC member; Dr. Mohammed Akhtar, member, CWPC 1976, Dr. Robert Watson, member, 1975, 1976 CWPC;) Testimony of colleagues in plaintiff's department indicated that they considered him to be an average teacher. (Testimony of Dr. Michael Detlefsen, professor of mathematics; Dr. Clair McClure,

professor of mathematics: plaintiff was a weaker teacher than other members of department).

In 1972–73, a year when Dr. Hou's department chair recommended him for promotion, the College-Wide Committee did not recommend plaintiff for promotion. In a memo from Louis Razzano, chair of the CWPC to President Watrel, dated March 5, 1973, the Committee stated:

> ... The promotions committee sagaciously and prudently reviewed each applicant's credentials, considering these against Faculty Council Guidelines and against the credentials of others who were applying *within the rank campuswide.* If our results appear to be too stringent and restrictive, we hope, nonetheless, that they are fair and equitable.

(Plaintiff's Exh. 81). (emphasis added)

While plaintiff may have been treated differently from other colleagues in the math department in the sense that he was not promoted, we see no indication that this was the result of discrimination based on race or national origin. The CWPC met to consider applicants from the entire college faculty, and applicants were judged on that basis. A negative recommendation from the CWPC did not, necessarily, end the selection process, since the final decision as to promotion remained with the President. In 1975–76, another Oriental, Dr. Andrew Chen, a member of the Education Department, applied, along with Dr. Hou, and others, for promotion to full professor. He received a negative recommendation from the committee, along with fourteen other candidates, including Dr. Hou. (Plaintiff's Exh. 36, testimony of Dr. Roberts, Dr. Mary Alice Weller Paul, Chair, CWPC). Acting President Dr. Roberts promoted the five faculty members who were recommended for promotion to full professor by the CWPC. He also promoted five additional faculty members not recommended by the CWPC, including Dr. Chen. Dr. Roberts testified that he promoted Dr. Chen because of his outstanding teaching ability. Thus, of nineteen applicants for promotion in 1976, five were promoted with the recommendation of the CWPC, five, including an Oriental, were promoted without the CWPC recommendation, and nine were not promoted. Of the nine not promoted, only one, Dr. Hou, was Oriental.

In *Kunda v. Muhlenberg College,* 463 F.Supp. 294 (E.D.Pa.1978), *aff'd,* 621 F.2d 532 (3d Cir.1980), a tenure and promotion case brought under Title VII, the Court found that the college's reason for not promoting plaintiff was pretextual where it was limited to plaintiff's failure to obtain a M.A. degree, and where the decision was made in spite of the unanimous faculty opinion that plaintiff was an excellent teacher. *Id.* at 308. On appeal, the Court of Appeals for the Third Circuit noted, in affirming, that *Kunda* was a highly unusual case in that the finding of the trial court was *based* on the judgment of the university faculty that plaintiff was an excellent teacher and should be promoted. 621 F.2d 532, 548–49 (3d Cir.1980).

No such consensus existed as to Dr. Hou's teaching ability. We note the observation of the Court in *Kunda, supra,* that "... it is generally acknowledged that the faculty has at least the initial, if not the primary, responsibility for judging candidates. The peer review system has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution.'" 621 F.2d at 547–48 (quoting *Johnson v. University of Pittsburgh,* 435 F.Supp. 1328, 1346 (W.D.Pa.1977)). The court also noted that where adverse judgments as to the qualifications of an individual had been made by faculty, administration, or both, courts have shown reluctance to reverse these decisions. 621 F.2d at 548. *Accord, Gurmankin v. Costanzo,* 626 F.2d 1115, 1125 (3d Cir.1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 352 (1981) (with regard to propriety of awarding tenure, courts must be careful not to intrude into the institutional determination with regard to evaluation of the tenure candidate). The *Gurmankin* court also distinguished *Kunda* as a case where the achievements and qualifications of the candidate were not in dispute. *Id.*

Here, Dr. Hou alleged that standards for promotion were applied more stringently against him than against white faculty members, drawing attention to a report criticizing his lack of participation in college committee work. (Defendant's Exh. A, "Five Year Evaluation 1973–78 for Professor Roger H. Hou"). Plaintiff alleged that the report required him to personally participate on thirty committees. The report, in relevant part, states,

> The operation of the department depends on its members cooperating by serving, either voluntarily or by appointment, on at least thirty departmental, school, or college committees annually. Our evidence is that Dr. Hou is doing a minimal amount of departmental and college work other than teaching his normal course load. During the last five years he has served on the departmental Tenure and Sabbatical Leave committee twice, the Math 101 committee and the usual textbook selection committees. (Defendant's Exh. A).

While there is some ambiguity, we accept the testimony of numerous witnesses from the College that the evaluation merely referred to plaintiff's obligation to help meet the required departmental participation on thirty committees, not that each faculty member was expected to serve on thirty committees.

We have noted the college's presentation of a statistical analysis by its expert, Dr. Romboski, demonstrating that failure to be promoted, even after a number of applications, is not statistically significant. As the court stated in *Presseisen v. Swarthmore College*, 442 F.Supp. 593 (E.D.Pa. 1977), *aff'd*, 582 F.2d 1275 (3d Cir.1978), the best that can be said about statistical evidence concerning promotions is that it is a very difficult area to statistically harness. While plaintiff offered no statistical analysis of his own, we believe plaintiff's expert's rebuttal of the methodology of defendant's report serves to show the difficulty inherent in such an area. Even without the statistical report, we believe that the defendant has articulated a legitimate basis for disparate treatment of plaintiff which could be considered reasonable and supported by the evidence.

The major part of plaintiff's case was devoted to a recital of his own professional accomplishments. We do not, in any way, discount these, nor do we believe the college did, as evidenced by ratings of "excellent" in Mastery of Subject Matter. Testimony as to certain other accomplishments, such as Dr. Hou's success in tutoring math students for a national intercollegiate mathematics competition, the Putnam Competition, varied as to its bearing on teaching effectiveness. While Dr. Hou found the success of the participants reflective of his teaching effectiveness, other faculty members testified that the competition affected few students and was not in itself cause for him to be regarded as an excellent teacher. (Testimony of Dr. Roberts, Dr. Detlefsen).

## CONCLUSIONS OF LAW

We find that plaintiff has not proven by a preponderance of the evidence that defendant Slippery Rock College discriminated against plaintiff on the basis of race by failing to promote plaintiff to the rank of full professor, in violation of Title VII of the Civil Rights Act of 1964, as amended. Plaintiff presented a prima facie case of discrimination as to defendant's failure to grant a promotion to plaintiff. However, defendant has rebutted plaintiff's prima facie case, articulating a legitimate, non-discriminatory job-related reason for its decision not to promote plaintiff based on teaching effectiveness. Plaintiff was unable to show that this reason was pretextual.

Plaintiff has not proven, by a preponderance of the evidence, that he was subjected to different terms and conditions of employment because of race or national origin. To the contrary, it appears that plaintiff was judged by the same criteria as other faculty members and found deficient in one or more areas considered by the college to be important for promotion to full professor.

In summary, plaintiff has not shown that any disparate treatment was the result of purposeful discrimination in violation of Title VII of the Civil Rights Act of 1964, *as amended,* or in violation of 42 U.S.C. § 1981.

An appropriate order will issue.